UNITED STATES TRUST COMPANY OF NEW YORK, as Trustee under the Will of CHARLES F. G. HEYE, Deceased, Appellant and Respondent, *v.* GEORGE G. HEYE et al., Respondents and Appellants.

Decedent's estate — testamentary trust — trust fund consisting of corporate stocks — apportionment between life tenants and trust fund of earnings, profits and accumulations of the corporations — rules for such apportionment — when there has been a division of corporate property that part which consists of accumulated profits or earnings belongs to the life tenant and that which is capital to the remaindermen.

1. Although stockholders own, proportionately to their holdings, the right to share in the corporate assets, they belong to the corporation until the corporation agents exercise their discretion and divide them among the stockholders.

2. Where a trust fund consists of corporate stock the life tenant will ordinarily be limited to receiving only so much of the profits as the corporation sees fit to distribute in dividends, but when the accumulated profits come into the hands of the trustees in any form or manner, the life tenant is entitled to receive them.

3. The fundamental principle involved in these questions is whether there has been a *distribution* or *division* of the earnings, profits or accumulations of the corporation. Until there has been such division, the life tenant is not entitled to any increase in the value of the principal of the trust fund, or the capital and assets of the corporation, shares of which constitute the trust fund. But when there has been a division of the corporate property, no matter what form it may take, that part thereof which consists of accumulated profits or earnings belongs to the life tenant and that which is capital to the remainderman.

4. The statement of the directors, however, in taking the corporate action, or the entry in the corporation books, is not necessarily conclusive. Investigation is always permissible, and sometimes necessary, to determine whether or not the corporate property is being distributed or accumulations divided. The ground upon which the apportionment rule is based is that the life tenant ought to have the earnings when the company makes a disposition of them.

5. The foregoing rules applied where a residuary estate consisting of shares of stock in a number of corporations was left to a trustee to pay the net income, rents, issues and profits thereof to certain beneficiaries as by testator directed and the corporations in which testator owned stock were taken over by a holding corporation whose stock was given in exchange for that of the original corporation and thereafter the holding corporation having been dissolved by the Federal courts, there was distributed ratably to the shareholders of the principal company the shares to which they were equitably entitled in the stocks of the corporations that were parties to the combination. (*Matter of Osborne,* 209 N. Y. 450, 477; *Matter of Brann,* 219 N. Y. 263; *Equitable Life Assurance Society of U. S.* v. *Union Pacific R. R. Co.,* 212 N. Y. 360, distinguished.)

*United States Trust Company of New York* v. *Heye,* 181 App. Div. 544, modified.

(Argued June 13, 1918; decided October 8, 1918.)

CROSS-APPEALS from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered February 15, 1918, which modified and affirmed as modified a judgment of Special Term, entered upon the report of a referee, settling the accounts of a trustee.

The facts, so far as material, are stated in the opinion.

*George L. Shearer* for plaintiff, appellant and respondent. The stocks of subsidiary corporations distributed by the Standard Oil Company (New Jersey) in December, 1911, and January, 1912, form part of the capital of the trust estates. (*Stewart* v. *Phelps,* 71 App. Div. 91; 173 N. Y. 621; *Irving* v. *Houston,* 4 Paten Sc. App. 521; *Paris* v. *Paris,* 10 Ves., Jr., 185; *Clayton* v. *Greshan,* 10 Ves., Jr.,

288; *Witts* v. *Steere*, 13 Ves., Jr., 363; *Barclay* v. *Wainewright*, 14 Ves., Jr., 66; *Bates* v. *MacKinley*, 31 Beav. 280; *Matter of Barton's Trust*, L. R. 5 Eq. 238; *Matter of Hopkins' Trust*, L. R. 18 Eq. 696; *Sproule* v. *Bouch*, 29 Ch. D. 635; *Matter of Tindale*, 9 T. L. R. [1892] 24; *Matter of Malam*, 63 L. J. Ch. 797; *Jones* v. *Evans*, 1 Ch. [1913] 23.) Extraordinary dividends declared since December 1, 1911, should be apportioned as of that date. (*Thayer* v. *Burr*, 201 N. Y. 155; *Matter of Megrue*, 168 N. Y. Supp. 1094; *Irving* v. *Houston*, 4 Paten Sc. App. 521; *Bouch* v. *Sproule*, 12 App. Cas. 385; *Jones* v. *Evans*, 1 Ch. [1913] 23; *Nesbit's Settlement*, 27 T. L. R. 461; *Gibbons* v. *Mahon*, 136 U. S. 549; *Minot* v. *Paine*, 99 Mass. 101; *Daland* v. *Williams*, 101 Mass. 571; *Leland* v. *Hayden*, 102 Mass. 542; *Gardiner* v. *Gardiner*, 212 Mass. 508; *Bryan* v. *Aiken*, 82 Atl. Rep. 817.) Stock acquired under rights and the proceeds of rights sold belong to capital. (*Richmond* v. *Richmond*, 123 App. Div. 117; 196 N. Y. 535; *Matter of Kernochan*, 104 N. Y. 618; *Robertson* v. *de Brulatour*, 188 N. Y. 301; *Stewart* v. *Phelps*, 71 App. Div. 91; 173 N. Y. 621.) Where a cash dividend accompanies rights to subscribe that dividend should be apportioned and the rights should go to principal. (*Matter of Hidden*, 63 Misc. Rep. 535.)

*Hugo Kohlmann* and *F. Kingsbury Curtis* for George G. Heye et al., respondents and appellants. The corpus of the trust fund consists of the shares of Standard Oil Company (New Jersey) received by the trustee in 1899 in exchange for the transfer of the shares in the twenty companies. (*Harriman* v. *Northern Securities Co.*, 197 U. S. 244.) The shares distributed in 1911 by the Standard Oil Company (New Jersey) constitute an extraordinary dividend declared and paid by said corporation. (*Matter of Brann*, 219 N. Y. 263; *E. L. Assur. Society* v. *U. P. R. R. Co.*, 212 N. Y. 360; *Matter of*

*Osborne,* 209 N. Y. 450.) The life beneficiaries are entitled to all distributions from corporate surplus or reserved profits from earnings (not including unearned increment, increased value of real estate, unrealized market or paper profit, etc.) to the extent to which the same may be awarded to the life beneficiaries without impairing the book value of the trust investment as of the date of the commencement of the trust or the making of the investment. The character of the property distributed and the manner of its use by the corporation prior to the distribution, are of no importance. (*Matter of Schaefer,* 222 N. Y. 533; 178 App. Div. 117; *Matter of Osborne,* 209 N. Y. 450; *Anderson* v. *F. L. & T. Co.,* 241 Fed. Rep. 322; *R. E. T. Ins. & Trust Co.* v. *Lederer,* 229 Fed. Rep. 799; *E. T. Assur. Soc.* v. *U. P. R. R. Co.,* 212 N. Y. 360; 162 App. Div. 81; *Williams* v. *W. U. Tel. Co.,* 93 N. Y. 162; *Lowey* v. *F. L. & T. Co.,* 172 N. Y. 137; *Robertson* v. *de Brulatour,* 188 N. Y. 301; *Smith* v. *Dana,* 77 Conn. 543; *Hurtley* v. *Pioneer Iron Works,* 181 N. Y. 73.) The testator himself could not have made provision for adding the securities distributed in 1911 to the principal of the respective trusts or otherwise accumulating earnings without violating the provisions of law against accumulations. (*Matter of Rogers,* 22 App. Div. 428; *Matter of Megrue,* 170 App. Div. 653; 217 N. Y. 623.) Every consideration of justice as well as the controlling authorities protect the life beneficiaries in their vested rights to the securities distributed out of " reserved profits " or " accumulated profits " in December, 1911. (*Matter of Schaefer,* 178 App. Div. 117; *Lawrence* v. *Littlefield,* 215 N. Y. 561; *Matter of Osborne,* 209 N. Y. 450.) The life beneficiaries are entitled in any event to all extraordinary dividends, distributions and subscription rights made or offered since December 1, 1911, by former subsidiaries of Standard Oil Company (New Jersey). (*Matter of Osborne,*

209 N. Y. 450.) The stock of Illinois Pipe Line Company and Prairie Pipe Line Company distributed respectively in 1915 by Ohio Oil Company and Prairie Oil and Gas Company should all be awarded to the life beneficiaries irrespective of whether any of the shares of the said corporations distributing the same be or be not awarded to them. (*Matter of Megrue,* 168 N. Y. Supp. 1094; *Hazzard* v. *Philips,* 173 App. Div. 425; *E. L. Assur. Society* v. *U. P. R. R. Co.,* 212 N. Y. 360; *Matter of Philbrick,* N. Y. L. J. May 21, 1915; *Robertson* v. *de Brulatour,* 188 N. Y. 301.) All stock subscription rights offered in respect to any shares comprised in the principal of the trust are apportionable between principal and income so as to award to the life beneficiaries so much of the value of such subscription rights as is due to profits earned during the period of the life estates. (*Matter of Harteau,* 204 N. Y. 292; *Brown* v. *Brown,* 72 N. J. Eq. 667; *Matter of Osborne,* 209 N. Y. 450; *Matter of Kernochan,* 104 N. Y. 618; *Robertson* v. *de Brulatour,* 188 N. Y. 301.; *Holbrook* v. *Holbrook,* 74 N. H. 201; *Stokes* v. *Cont. Trust Co.,* 186 N. Y. 285.) If any of the stocks of the subsidiary companies distributed in 1911 be held to be part of the trust fund, such stocks did not then in 1911 for the first time become part of the trust fund but, for the purposes of the application of the *Osborne* case with reference to subsequent extraordinary dividends, had been part of the trust fund since the date either of the establishment of the trust as to such shares as were held in 1899 or of the subsequent acquisition by Standard Oil Company (New Jersey) of such shares as were acquired subsequently to 1899. (*Hazzard* v. *Philips,* 173 App. Div. 425; *Farmers' Loan & Trust Co.* v. *Francis,* N. Y. L. J. June 19, 1915; *Matter of Tod,* 85 Misc. Rep. 298; *Matter of Megrue,* 170 App. Div. 653; 217 N. Y. 623; *Matter of Osborne,* 209 N. Y. 450.)

*Eugene D. Alexander* for Dorothy H. Clemens et al., defendants, respondents and appellants. The holding by the referee that the stock distribution pursuant to the court decree was assignable to principal is correct and the judgment on this point should be affirmed, without modification. (*Matter of Osborne,* 209 N. Y. 450; *Matter of Schaefer,* 178 App. Div. 117; 222 N. Y. 531.) The date of apportionment of the extraordinary Standard Oil dividends should be as of December 1, 1911. (*Matter of Osborne,* 209 N. Y. 474.) The pipe line stock distribution was a transfer of capital. (*Matter of Megrue,* 168 N. Y. Supp. 1094.) The judgment finally directing distribution should provide: (1) That all the stocks distributed pursuant to the United States Supreme Court decree are assignable to principal; (2) that extraordinary stock or cash dividends should be apportioned as of the date when the stock in question was acquired by the trustee (December 1, 1911, in most cases); (3) that the pipe line stocks are distributable to capital; (4) that rights to subscribe are principal; (5) that such relief should be with costs. (*Matter of Osborne,* 209 N. Y. 450.)

*John Willett* for Mildred A. Heye et al., defendants, respondents and appellants. The distribution in December, 1911, was not a distribution of earnings. (*E. L. Assur. Society* v. *U. P. R. R. Co.,* 212 N. Y. 360; *Matter of Kernochan,* 104 N. Y. 618; *Matter of Rogers,* 161 N. Y. 108.) Stock subscription rights belong to capital. (*Matter of Kernochan,* 104 N. Y. 618; *Robertson* v. *de Brulatour,* 188 N. Y. 301; *Matter of Richmond* v. *Richmond,* 123 App. Div. 177; 96 N. Y. 535.) The increases in the capital stock of the subsidiary companies were made to make the capital stock of each correspondent with its actual working capital. (*Chester* v. *Buffalo Car Mfg. Co.,* 70 App. Div. 443.) The assets

owned by the subsidiary companies whose stocks were distributed in 1911 were capital assets of the enterprise and cannot now be changed by any action of their respective boards of directors. (*Matter of Osborne,* 209 N. Y. 450.) The disposition of the pipe line companies' stocks was properly held by the court below to be corpus assets. (*Matter of Megrue,* 168 N. Y. Supp. 1094.)

*Egerton L. Winthrop, Jr., Cyrus C. Turner, Jr., Stephen P. Anderton, A. Perry Osborn, Frank L. Hall, Ernest P. Hoes, William W. Ladd, Richard V. Lindabury, John A. Garver, Frederick Geller, Edward H. Blanc* and *Charles Angulo, amici curiæ.*

CRANE, J. This action was brought by the United States Trust Company of New York, as trustee under the will of Charles F. G. Heye, deceased, for the purpose of obtaining a judicial settlement of its accounts as trustee from the commencement of its administration on May 10, 1899, to the present time, and for the purpose of obtaining the instruction of the court as to the disposition to be made of the securities distributed to it by the Standard Oil Company (New Jersey) on or about December 1, 1911, and of the extraordinary dividends and stock subscription rights declared and offered by former subsidiary companies of the Standard Oil Company.

Charles F. G. Heye died February 8, 1899. His will divided his residuary estate into three equal shares and created three separate trusts for the benefit respectively of his wife, Marie Antoinette Heye, his daughter, Marie Heye Clemens, and his son, George Gustav Heye. The United States Trust Company of New York was appointed trustee and directed to pay and apply " the net income, rents, issues and profits " of one part to the use of the wife for life, the principal to go to such persons as she might appoint by will, and, in default of appointment,

to his children; the net income of another part was to be applied to the use of his daughter during her life, the principal upon her death to go to her issue; and the income of the third part was to be applied to the use of the son until he arrived at a certain age when the principal, excepting $100,000 reserved in trust, was to be paid over to him.

At the time of his death, Charles F. G. Heye owned and possessed certificates for certain shares of the capital stock of twenty corporations which had previously constituted the Standard Oil Trust, created by agreement in 1882. This trust had been dissolved. Omitting the fractions, the number of shares owned in the various companies was as follows:

Anglo-American Oil Co., Limited, 98; The Atlantic Refining Co., 190; The Buckeye Pipe Line Co., 760; Eureka Pipe Line Co., 190; Forest Oil Company, 209; Indiana Pipe Line Co., 76; National Transit Co., 1,936; New York Transit Co., 190; Northern Pipe Line Co., 38; The N. W. Ohio Natural Gas Co., 124; The Ohio Oil Co., 304; The Solar Refining Co., 19; Southern Pipe Line Co., 190; South Penn Oil Co., 95; Standard Oil Co. (Indiana), 38; Standard Oil Co. (Kentucky), 38; Standard Oil Co. (New Jersey), 380; Standard Oil Company of New York, 266; Standard Oil Co. (Ohio), 133; Union Tank Line Co., 133.

The certificates for these shares were delivered by the executrix of the will to the trustee on May 10, 1899.

In that year, the Standard Oil Company (New Jersey) increased its capital stock from 100,000 shares of the par value of $10,000,000 to 1,100,000 shares of the par value of $110,000,000 for the purpose of taking over and absorbing the other Standard Oil concerns. Accordingly, the plaintiff, on August 11, 1899, surrendered to the Standard Oil Company (New Jersey) all the above-mentioned certificates of stock in the twenty companies

and received in return 3,700 shares of the common stock of said company, which it divided among the three trusts named. At this time the Standard Oil Company also owned or controlled other subsidiary companies and thereafter acquired more, so that in December of 1911 it owned and controlled all or a majority of the stock of thirty-three companies engaged in ·the oil business. While the individuality of each of the corporations was maintained and its business transactions kept separate and distinct, yet the Standard Oil Company (New Jersey) and its various subsidiary corporations constituted but one business, all the funds being employed and utilized for the furtherance and development of the organization. The business of producing, refining and distributing oil was carried on by the Standard Oil Company (New Jersey) through these various corporations.

In an action brought by the United States government against the Standard Oil Company and its subsidiary companies, it was decreed, in 1911, by the United States Circuit Court (Eastern District of Missouri) that the business as conducted by the defendants was an unlawful combination and a conspiracy in restraint of trade, and the Standard Oil Company (New Jersey) was restrained from exercising any control over, or voting the stocks of, the various companies held by it, defendants to the suit. The decree, however, expressly provided that the defendants " are not prohibited by this decree from distributing ratably to the shareholders of the principal company the shares to which they are equitably entitled in the stocks of the defendant corporations that are parties to the combination." The directors of the Standard Oil Company thereupon determined to distribute ratably to the stockholders the shares of stock of each of the corporations owned by the New Jersey company, and a resolution was passed, on July 20, 1911, to carry out this purpose. On December 1,

1911, all the stocks were thus distributed, except the stock of the Anglo-American Oil Company which was distributed on January 20, 1912.

The plaintiff, as trustee, under this distribution received back certificates of stock in seventeen of the companies whose stock had been turned over to the Standard Oil Company (New Jersey) in 1899, the Forest Oil Company, one of the remaining two corporations, having been absorbed by the South Penn Oil Co. in 1902, and the stock of the N. W. Ohio Natural Gas Co. not being distributed.

The companies owned by the Standard Oil Company of New Jersey in 1899 and prior to the testator's death were the following: Borne Scrymser Company; Chesebrough Mfg. Company; Continental Oil Company; Galena Signal Oil Company (representing the consolidation of Galena Oil Co. and Signal Oil Company); Standard Oil Co. (Kansas); Swan & Finch Company; Vacuum Oil Company; Waters-Pierce Oil Company.

Three new companies were formed whose stocks were acquired by the Standard Oil Company (New Jersey) subsequent to 1899. They were: The Colonial Oil Company; Standard Oil Company (California); Standard Oil Company (Nebraska).

The stock of three companies was acquired by the Standard Oil Company (New Jersey) subsequent to December of 1899 from its subsidiary company, the National Transit Company. The Standard Oil Company owned the National Transit Company. These three companies were: The S. W. Penn Pipe Line Company; Washington Oil Company; Crescent Pipe Line Company.

The stock of two companies was distributed in December, 1911, by the National Transit Company pursuant to a request resolution of its owner, the Standard Oil Company (New Jersey). These were: Cumberland Pipe Line Company; Prairie Oil and Gas Company.

The plaintiff, as trustee, received its proportion of stock in these sixteen companies upon the distribution by the Standard Oil Company (New Jersey), making in all thirty-three different stocks received by it. This distribution by the Standard Oil Company (New Jersey) of the above stocks took place without any reduction or recall of its own capital stock, so that the plaintiff, after distribution, had both the stock of the New Jersey company issued to it in 1899 and these shares of the subsidiary companies returned or distributed. The amount of the distribution was charged on the books of the company to reserve profits account.

Upon the accounting of the United States Trust Company of New York as trustee under the will of Charles F. G. Heye, the life beneficiaries have insisted that the entire distribution of stock made by the Standard Oil Company (New Jersey) in December of 1911 and January of 1912 belonged to them, as representing a distribution of profits, leaving the corpus of the trust of the same value as at the time of its creation. Much emphasis has been placed upon the fact that the book value of the stock of the Standard Oil Company of New Jersey on December 31, 1899, was $202.32 per share; that before the distribution of December 1, 1911, accumulated earnings had brought this value up to $566.67, and that after this distribution the book value was $281.72 per share. The idea prevailing with these claimants seems to have been that the value of the principal at the time of the creation of the trust determines the rights of the life beneficiaries and the remaindermen; that so long as the principal is in no way depleted or lessened, all the subsequent increase in value must be categoried as income, whether distributed as such or not. *Matter of Osborne* (209 N. Y. 450, 477) is given as authority for this proposition, but that case went no further than to hold that the principal of a trust fund invested in corporate

stock should not be impaired by the division of accumu-
lated surplus among life beneficiaries. "Extraordinary
dividends," it was there said, "payable from the accumu-
lated earnings of the company, whether payable in cash
or stock, belong to the life beneficiary, unless they intrench
in whole or in part upon the capital of the trust fund as
received from the testator or maker of the trust or invested
in the stock, in which case such extraordinary dividends
should be returned to the trust fund or apportioned
between the trust fund and the life beneficiary in such a
way as to preserve the integrity of the trust fund." This
does not mean that the principal of the trust fund has
to remain at the same value, and that all increase belongs
to the life beneficiaries. While the corpus of the fund
may not be depleted, yet the corpus may accumulate
or increase, and until there is some division in the nature
of a dividend payable out of accumulated earnings or
profits, there is nothing that can be awarded as income
to beneficiaries.

Although stockholders own, proportionately to their
holdings, the right to share in the corporate assets, they
belong to the corporation until the corporation agents
exercise their discretion and divide them among the
stockholders. (*Robertson* v. *de Brulatour*, 188 N. Y. 301.)
As a testator may dispose of his corporate holdings as
he pleases, the first thing to be ascertained in cases of
this kind is the intention as expressed in the will. In
this case, Charles F. G. Heye gave the residue of his
estate to the United States Trust Company of New
York "to collect and receive the income, rents, issues
and profits thereof and to pay and apply the net income,
rents, issues and profits to the use of" the three bene-
ficiaries above named. As the stocks of the Standard
Oil Company formed part of this trust fund, the income
and profits thereof passed to the life beneficiaries. It is
to be presumed that the settlor meant to indicate by

the use of the words " income " and " profits " pretty much everything in the way of advantage or benefit which might accrue from the stock without decreasing the original value of the capital which it represented. (*Boyer's Appeal*, 224 Pa. St. 144, 153.)   As said in the *Robertson Case (supra):* " That which the directors of the corporation distribute among its stockholders, without intrenchment upon capital, must be comprehended within the term ' profits,' and we should assume that the testator intended that what might be paid in that way should belong to the beneficiary." (p. 311.)  The statement of the directors, however, in taking the corporate action, or the entry in the corporation books, is not necessarily conclusive.   Investigation is always permissible, and sometimes necessary, to determine whether or not the corporate property is being distributed or accumulations divided.   The ground upon which the apportionment rule is based is that the life tenant ought to have the earnings when the company makes a disposition of them.   (*Day v. Faulks*, 79 N. J. Eq. 66, 70.)   Whenever a disposition of corporate earnings is made in any form, the distributive share, so far as the owner of stock is concerned, is income, and so an incident of the ownership of the stock during the period of accumulation, although inchoate until the distribution by the corporation.   (*Matter of Heaton's Estate*, 89 Vt. 550.)   The latest expression of the rule in this state may be found in *Matter of Schaefer* (178 App. Div. 117; 222 N. Y. 533): " Where the trust fund consists of corporate stock the life tenant will ordinarily be limited to receiving only so much of the profits as the corporation sees fit to distribute in dividends, but when the accumulated profits come into the hands of the trustees in any form or manner, the life tenant is entitled to receive them." (p. 122.)

The fundamental principle involved in these questions is whether there has been a *distribution* or *division* of the

earnings, profits or accumulations of the corporation. Until there has been such division, the life tenant is not entitled to any increase in the value of the principal of the trust fund, or the capital and assets of the corporation, shares of which constitute the trust fund. But when there has been a division of the corporate property, no matter what form it may take, that part thereof which consists of accumulated profits or earnings belongs to the life tenant and that which is capital to the remainderman. Each case necessarily is determined by its own facts. " Probably no rule could be framed which would work exact justice in all cases." (*Boyer Case, supra.*) In the *Osborne* case we said: " We think that in each case the court should look into the facts, circumstances and nature of the transaction and determine the nature of the dividend and the rights of the contending parties according to justice and equity." (p. 475.)

*Matter of Brann* (219 N. Y. 263) is not conclusive upon this point as the question involved the construction of a will, and the language used was not directed to the proper apportionment between life tenant and remainderman. So, too, with *Equitable Life Assurance Society of U. S.* v. *Union Pacific R. R. Co.* (212 N. Y. 360). Judge HISCOCK distinctly stated that the case was not similar to the case of an apportionment between income and principal.

Applying the rule as stated to the distribution made in December of 1911 by the Standard Oil Company (New Jersey), it is plainly to be seen that, as to the companies in existence at the time of the creation of the trust, there was no payment of a dividend or division of profits or distribution of surplus, although the shares of stock returned and the New Jersey stock retained by the trustee may have greatly increased in value. The company gave back to the trustee what it formerly had possessed and also what had been represented in 1899

by the Standard Oil stock (New Jersey) owned by the testator. The trustee had exchanged the stock in twenty companies for the stock of the Standard Oil Company (New Jersey), which thereafter represented these. In December, 1911, the Standard Oil Company gave back seventeen of the twenty stocks, and thereafter the Standard Oil certificates no longer represented the interests of the seventeen. Neither did they continue to represent the sixteen other stocks also distributed to the trustee which, in 1899, were owned by the Standard Oil Company (New Jersey) and represented by its stock. The exchange of paper title or the creation of one paper to represent twenty, or twenty to represent one, did not in any way increase or lessen the interest or ownership. The enhancement of value was not an increase of interest; the proportionate part owned by the trustee in the Standard Oil Company industries, whether two or many, always remained the same.

We, therefore, hold that as to the various shares of stock above classified and distributed in December, 1911, the following constituted a rearrangement of the principal, a readjustment of the indicia of ownership, and not a division of accumulated profits or in any sense an extraordinary dividend:

*First,* the shares of stock of the seventeen original companies acquired by the Standard Oil Company in 1899 in exchange for its own stock;

*Second,* the shares of stock of the eight companies owned by the Standard Oil Company in 1899 and prior to the testator's death;

*Third,* the shares of stock of the three companies owned prior to 1899 by the National Transit Company; and

*Fourth,* the shares of stock of the two companies distributed by the National Transit Company in 1911. These were the Cumberland Pipe Line Company and

the Prairie Oil and Gas Company which were organized by the National Transit Company for the purpose of adding to the working plant and the business of the company and constituted a part of its capital assets. The National Transit Company was one of the twenty subsidiary companies whose shares were held by the testator when he died. The stock of the two named companies, afterwards acquired by the Transit Company, is not shown to have been bought with surplus earnings. Furthermore it appears that the National Transit Company made a reduction in its capital stock to meet this severance or distribution, the par value of its shares being reduced from $50 to $25 per share.

As to the Colonial Oil Company, the Standard Oil Company (California) and the Standard Oil Company of Nebraska, we differ in part in the conclusion reached by the court below. We agree that the distribution of the stock of the Colonial Oil Company was properly passed to income. The company was organized in March of 1901, its stock of $250,000 being taken by the Standard Oil Company (New Jersey) for cash at par. On October 25, 1915, the company was dissolved and the capital distributed to its stockholders, the plaintiff receiving $100 for each share of stock. This was, therefore, a distribution of accumulated profits under the rule of the *Schaefer Case (supra)*. This should go, as directed by the Appellate Division, to the life tenant.

As to the stock of the Standard Oil Company (California), we are of the opinion that part should go to capital and part to income. The Standard Oil Company (California) was originally organized under the name Pacific Coast Oil Company. Its capital stock was $1,000,000, all of which was purchased in December, 1900, by the Standard Oil Company (New Jersey). At the time of the purchase the company owned a small refinery near San Francisco, and a small amount of

17

producing property. The name of the company was changed to the Standard Oil Company (California), and its stock was increased to $17,000,000, all the additional stock being taken by the Standard Oil Company (New Jersey). It erected a very large refinery at San Francisco and constructed an extensive system of pipe lines and acquired a large amount of producing property. In 1906 all of the property, real and personal, of the Standard Oil Company (Iowa), which did the marketing business of the Standard Oil Companies in the states of California, Washington, Oregon, Nevada and in Arizona, Alaska, the Northwest Territories, Honolulu and the Hawaiian Islands, was transferred to the Standard Oil Company (California), and at the time of the distribution of stocks in 1911, that company did the Standard Oil marketing business in the states and territories above mentioned. The Standard Oil Company (Iowa), whose properties were taken over by the Standard Oil Company (California), was incorporated in 1885. Sixty per cent of its stock was taken by the trustees of the Standard Oil Trust and all thereafter purchased by the Standard Oil Company (New Jersey). The Standard Oil Company (Iowa), at the time of its organization, took over from the Standard Oil Company (Ohio) the marketing business and facilities which had been established by the Standard Oil Company in the Pacific Coast states. The capitalization of this California company was increased as follows: On July 1, 1902, to $3,000,000, consisting of 300,000 shares of $10 each; on May 6, 1903, to $6,000,000, consisting of 600,000 shares of $10 each; on October 16, 1906, to $17,000,000, consisting of 170,000 shares of $100 each; and on August 7, 1911, to $25,000,000, consisting of 250,000 shares of $100 each. The $6,000,000 increase on May 6, 1903, was issued against the purchase in 1902 of the property of the Pacific Coast Oil Company. This was an application of the surplus accumulated after

1899.   All the increases of stock were issued for cash at par to the Standard Oil Company (New Jersey) at or about the time when such increases took place.   The increase in 1906 to $17,000,000 was by the additional issue of $11,000,000 in stock to purchase the Iowa company which belonged to the Standard Oil Company prior to 1899.   It was an exchange of the Iowa stock for California stock and comes within the ruling first above stated.   The final increase in 1911 to $25,000,000 was made from accumulated earnings.   Eleven-twenty-fifths, therefore, of the stock of the California company should be deemed capital, and fourteen-twenty-fifths income.

The next question arises as to the Standard Oil Company (Nebraska).   This, we think, should go to capital and not to income as directed by the Appellate Division. The Standard Oil Company (Nebraska) was organized in 1906 to take over the marketing business in Nebraska theretofore carried on by the Standard Oil Company (Indiana).   The Standard Oil Company (Indiana) was incorporated in 1889, all of its stock being taken by the trustees of the Standard Oil Trust.   In 1906 it transferred to the Standard Oil Company (Nebraska) its marketing stations, facilities and other properties located in the state of Nebraska.   The creation of the Standard Oil Company (Nebraska) was for the purpose of taking over the Standard Oil Company (Indiana) and amounted to merely an exchange of stock.   The Nebraska company thereafter continued the work of the Indiana company with its plants, facilities and equipments and possessed that which had theretofore been owned and controlled by the Standard Oil Trust.   For reasons stated this stock must go to principal.   The stock dividends, however, of 1912 and 1913 were properly applied to income as they were declared out of accumulated profits.

A remaining question arises regarding the distribution of the shares of the Illinois Pipe Line Company and

those of the Prairie Pipe Line Company which have been allotted to capital. The majority of this court are of the opinion that they constituted a distribution of surplus earnings and should have been given to the life beneficiaries. The facts are these. The Ohio Oil Company was organized in 1887, under the laws of Ohio. The National Transit Company purchased the entire stock in 1899 and subsequently transferred it to the Standard Oil trustees. The Ohio Oil Company was the producing company operating in the Ohio field to procure oil for the supply of the various Standard Oil refineries. It had extended its operation into what was known as the newly discovered Illinois field. It had constructed a very extensive system of private pipe lines extending from the Mississippi river to the Pennsylvania border and, by means of leased lines across Pennsylvania, to the New Jersey border. Prior, however, to the year 1906, the company neither owned nor operated any pipe line. In June, 1912, the interstate commerce commission instituted a proceeding entitled " In the Matter of Pipe Lines, No. 4199," in which the Ohio Oil Company was made a respondent. It was ordered to file with the commission schedules of its rates and charges for the transportation of oil. Thereafter the Ohio Oil Company, in order to avoid this governmental supervision, sold and transferred its pipe lines to the Illinois Pipe Line Company for $20,000,000, receiving therefor 200,000 shares of capital stock, which by resolution in January of 1915 was distributed *pro rata* to the stockholders of the Ohio Oil Company of whom this trustee was one.

The purchase or construction of these pipe lines by the Ohio company in and after 1906 must necessarily have been out of its earnings. Upon sale to the Illinois Pipe Line Company, the 200,000 shares of stock of that company represented these earnings. In dividing this stock among its stockholders, the Ohio Oil Company,

therefore, divided its accumulated earnings or profits, which should be allotted, in our opinion, as above stated to the life beneficiaries.

If the cost of these pipe lines constructed and purchased by the Ohio company was not out of its accumulated earnings or surplus it must have been out of the proceeds from the sale of its increased capital stock taken by the Standard Oil Company of New Jersey for cash. The capital of the Ohio Oil Company was increased from $2,000,000 in 1907 to $10,000,000; in January, 1908, to $12,500,000, and in April, 1908, to $15,000,000. All the increased stock was sold for cash at par to the Standard Oil Company of New Jersey. When we consider that between January 1, 1899, and December 1, 1911, the Standard Oil Company of New Jersey earned net $825,893,961.13 and during the same period distributed to the stockholders in dividends $495,202,173, reserving as working capital $328,691,788.13, it is reasonable to presume that the cash given for the increased stock of the Ohio Oil Company came from the accumulated earnings of the New Jersey company. Upon the books of the Ohio Oil Company the pipe line properties were referred to as " Pipe Line Investments." When the stock, therefore, of the Illinois Pipe Line Company was distributed to the stockholders of the Ohio Oil Company it was a distribution of property or the interest in property purchased by the accumulated earnings of the Standard Oil Company, assuming as we have done that the cash paid for the increase in stock went into the pipe lines. Whether, therefore, we consider the cost of the pipe lines as coming out of surplus of the Ohio Oil Company or the surplus of the Standard Oil Company the result is the same. The pipe line company's stock constituted a distribution of surplus earnings and passed to the life beneficiaries.

What has here been said equally applies to the Prairie

Pipe Line Company's stock distributed by the Prairie Oil and Gas Company. This latter company organized in 1900 was the Standard Oil producing company in the mid-continent field. It supplied from that field a very large part of the oil used by the Standard Oil refineries and to enable it to do so it had constructed, and at the time of the distribution of the stocks in 1911, owned an extensive system of private pipe lines including the trunk lines extending from the Oklahoma fields to Griffith, Indiana, where they connected with the lines of the Indiana company so as to form a continuous line from the mid-continent field to the seaboard. As a result of proceedings instituted by the interstate commerce commission, the Prairie Oil and Gas Company, in February of 1915, sold and transferred its pipe lines to the Prairie Pipe Line Company for 270,000 shares of the stock of that company of the par value of $100, and these it distributed *pro rata* among the stockholders of the Prairie Oil and Gas Company. For the reasons stated above the stock received by the trustee herein should go to the life beneficiaries. (*Hazzard* v. *Phillips*, 173 App. Div. 425.)

The increase in the capital stock of some of the subsidiary companies made between 1899 and 1911 (except as above modified), the stock dividends declared and paid to the Standard Oil Company (New Jersey) during the same time by others, and the stock dividends declared since December, 1911, by corporations whose shares were distributed by the Standard Oil Company (New Jersey) in December, 1911, were properly disposed of by the court below.

Two companies, the South Penn Oil Company and the Standard Oil Company (California), offered to stockholders rights to subscribe for additional stock at par. We have recently reaffirmed the rule (*Baker* v. *Thompson*, 224 N. Y. 592) that such rights to subscribe and the

proceeds of the sale of such subscription rights belong to the principal of the trust and that the life beneficiaries are not entitled thereto.

The judgment of the Appellate Division should be modified to the following extent: Eleven-twenty-fifths of the stock of the Standard Oil Company (California) is apportioned to capital, and fourteen-twenty-fifths to the life beneficiaries; all the stock of the Standard Oil Company (Nebraska) is apportioned to capital; the shares of stock in the Illinois' Pipe Line Company and the Prairie Pipe Line Company should pass to income and the life beneficiaries. In all other respects the judgment of the Appellate Division should be affirmed, without costs to either party in this court.

Hiscock, Ch. J., Collin, Hogan, Cardozo, Pound and Andrews, JJ., concur.

Judgment accordingly.